J. A. ANSLEY & Co., plaintiffs in error, vs. ANDERSON, ADAIR & Co., defendants in error.

A. a commission merchant of Atlanta, had in store 20 hogsheads of sugar, belonging to H, which by mistake he sent to B. of Augusta, to be sold for Confederate notes, at 58 cents, per pound. B, made the sale and tendered the proceeds to A, who having learned the mistake in the mean time, refused to receive them, claiming the sugars instead. B. also tendered the notes to H, who refused to receive them. B, deposited the amount in hand, in his own name, notifying A that it was so deposited, and was subject to his order at any time. A. brought an action of Trover against B, for the sugars, and pending the litigation the notes became worthless:—Held that A. is not entitled to recover; that the Confederate notes were the property of A. in the hands of B., and that B. was not an insurer against depreciation, but was bound for only reasonable care in keeping the notes, and to deliver them whenever A. would receive them.

Trover.    In Richmond Superior Court.    Tried before Judge W. M. REESE.    April Term, 1866.

This action was brought in August 1863, by Anderson, Adair & Co., against J. A. Ansley & Co., to recover for the conversion of twenty hogsheads of sugar.

The defendants, after the usual plea of not guilty, plead as follows: " That the plaintiffs at the time alleged in their petition were not possessed of the said goods and chattles in said petition mentioned, or any of them, or any part thereof, as of their own property, in manner and form as alleged.

That on the ¡twenty-fourth day of February, eighteen hun-

dred and sixty-three, one John L. Harris, of LaGrange, Georgia, authorized them to sell certain of his sugars, held by the plaintiffs, and instructed plaintiffs to send these defendants samples thereof.

"That thereupon plaintiffs sent to defendants samples of ninety-five hogsheads of sugar, as the property of, or under the control of, said Harris, and by which samples, the said ninety-five hogsheads were sold on the fifth day of March, eighteen hundred and sixty-three, by these defendants, and on their arrival were delivered to the purchaser: That of this ninety-five hogsheads are the twenty sued for by the plaintiffs, and which subsequently were ascertained to be the property of one John Harris, of Covington, Georgia, and not to have been under the control of said John L. Harris.

"That these defendants were not guilty of any conversion of the said twenty hogsheads, but allege the sale of the same to have been caused solely by the mistake of the plaintiffs themselves, which was not discovered until the entire lot of twenty hogsheads, except one, was delivered to the purchaser.

"That they are Factors and Commission Merchants: that the twenty hogsheads of sugar sued for were sold by them on the fifth of March, eighteen hundred and sixty-three, by a mistake of the plaintiffs: the same having been shipped by the plaintiffs to defendants, supposing them to be the property of one John L. Harris, who had authorized the defendants to sell his sugars then with plaintiffs: that upon making such sale and rendering account thereof, to said John L. Harris this mistake was discovered, and thereupon these defendants tendered the proceeds thereof, amounting to twelve thousand four hundred and seventy-eight dollars and seven cents, in Confederate States Treasury Notes, to John Harris, the true owner, and to the plaintiffs, both of whom refused to receive the same, by reason of which they remained in the hands of these defendants and have since become and now are utterly valueless.

"That no conversion of the sugar, or its proceeds, was ever made by these defendants."

The following facts, agreed on by the counsel, were submitted to the jury :

On the 23d February, 1863, John L. Harris, of LaGrange, Georgia, came to the city of Augusta and employed the defendants, who were Factors and Commission Merchants, to sell certain sugars for him, which were then in the possession of the plaintiffs in Atlanta, and telegraphed the plaintiffs to send samples of his sugars to the defendants. On the 24th February, the said John L. Harris, in the office of the defendants, wrote a letter in their presence to the plaintiffs, stating the fact of having telegraphed, and advising them that he had authorized defendants to sell the sugars at 58 cents per pound, delivered in Augusta, no statement being made to the defendants of the amount of the sugars.

The plaintiffs received the telegram and letter, and on the 27th February, shipped to defendants samples of ninety-five hogsheads of sugar as per instructions, marked J. L. H., E. B. W. and H. C. & Co.

Upon the receipt of the samples defendants sold the sugars to James A. Gray, March 5, 1863, at 58 cents per pound. Ninety-five hogsheads were sold and delivered: ninety-three on the 12th, and two on the 20th March, 1863. Immediately after the sale, notice was given to John L. Harris that the proceeds were subject to his order. Upon the receipt of this letter, John L. Harris wrote to plaintiffs that they had made a mistake in sending too much sugar. Upon the receipt of this letter the plaintiffs investigated the matter and found that they had shipped twenty hogsheads of sugar marked H. C. & Co., belonging to John Harris, of Covington, Georgia, supposing that the entire lot was controlled by John L. Harris, of LaGrange. That on the 18th March, they wrote defendants to this effect, who received the letter on the 19th, and this was the first information received by defendants of the mistake.

That all of the sugars had then been delivered to the purchaser, except two hogsheads, of which one only was of the H. C. & Co. lot: that defendants endeavored to rescind the

sale to Gray, to the extent of these 20 hogsheads of sugar, which he, Gray, declined to do.

The defendants then tendered the proceeds in Confederate Treasury Notes, for which the sale had been made by direction, and which amounted to twelve thousand four hundred and seventy-eight dollars and seven cents, to the plaintiffs, Anderson, Adair & Co., who refused to take it, claiming the sugars instead. A few days after, John Harris, the owner, called on the defendants, and they tendered the same amount to him, which he refused. Defendants then deposited the amount to their credit in Bank, notifying the plaintiffs that it was subject to their order at any time. The deposit was a general one, and January 6th, 1864, the amount was again formally tendered to the plaintiffs and refused : it was then again deposited in Bank. It was admitted that Ansley had a deposit at all times more than sufficient to satisfy plaintiffs' claim. In the interim, John Harris, of Covington, after having refused to accept the proceeds of the sale, set up a claim against the plaintiffs, which was submitted to arbitration, and an award was found against the plaintiffs for 77¼ cents a pound, April 24, 1863.

This they paid, and to the October Term, 1863, of Richmond Superior Court, brought their action of Trover, for the said twenty hogsheads of sugar, against the defendants. At the April Term, 1865, of said Court, a trial was had of the cause before the petit jury. The defendants produced the money into Court, where it remained until it became valueless, when it was withdrawn. Upon this trial, the defendants admitted the right of plaintiffs to recover for twelve thousand four hundred and seventy-eight dollars and seven cents, and a verdict was had for that amount only. The verdict having been general, and the plaintiffs' attorney refusing the Confederate currency, the defendants, in view of the then condition of political affairs, on the 24th day of April, 1865, entered an appeal, and the case came up for trial at April Term, 1866, on appeal.

The plaintiffs, conceding that they had no right to a larger

amount, claimed a verdict against the defendants, for two thousand four hundred and ninety-five dollars and sixty-one cents, being the amount the Confederate money tendered them was worth on the 5th March, 1863.    Defendants, waiving all exception to the form of plaintiffs' action, but desiring, if the plaintiffs were entitled to recover in any form of action, to have it determined, insisted that under the circumstances they were not liable to plaintiffs for any amount whatever.

The Court charged the jury that if the identical money tendered had been kept separate from all other, and marked as the plaintiffs', or had been deposited to credit of plaintiffs, it would have been at their risk, but having been used by defendants as their own, by being deposited to their credit, they must abide by the depreciation, and be held liable for the value of the Confederate notes at the time of the tender.

The jury, under this charge and under the direction of the Court, found for the plaintiffs the sum of two thousand four hundred and ninety-five dollars and sixty-one cents, to be paid in gold ; the same being the admitted value in specie of the net proceeds of the sugar on the day of sale.

To this charge and direction of the Court, the defendants, by their counsel, excepted, and now assign the same as error.

MILLER, for plaintiffs in error.

GOULD, for defendants.

WALKER, J.

Which of these parties should sustain the loss of the proceeds of the sale of the sugars ? Most assuredly the party who was at fault. Which party, then, was at fault ? The plaintiffs, by mistake, wrongfully sent the sugars to defendants to be sold. John L. Harris wrote to plaintiffs that he had authorized defendants to sell his sugars at 58 cents per pound, delivered in Augusta, no statement being made to defendants of the

amount of the sugars. Plaintiffs had possession of Harris' sugars, and under an order from him to send *his* sugars to defendants, they sent the twenty hogsheads in controversy. They were, with the others, sent by the plaintiffs to be sold and delivered; the defendants did sell and deliver, and immediately proposed to account for the proceeds. In what respect were they at fault? According to Harris' orders they made the contract of sale, and according to *plaintiffs' statement as to the quantity*, they made the delivery. They proposed to account with John L. Harris, and with the plaintiffs, and with John Harris, the true owner. Neither John L. Harris, their supposed principal, nor the plaintiffs, who had sent them the sugars, nor John Harris, the real owner, would receive the money.

Samples of each hogshead were to be sent *by the plaintiffs*, and the contract of sale was to be made by the samples sent. Plaintiffs sent ninety-five samples, and when notified of the making of the contract of sale, sent the same number of hogsheads, which included the twenty in controversy. Under these circumstances, the making of the sale by defendants could not be considered, *as against the plaintiffs*, a wrong.

It was urged that defendants were at fault in not learning from John L. Harris how many hogsheads he proposed to sell. But this was a matter of indifference to them. They were commission merchants, and of course were willing to sell whatever amount he might have sent to them for that purpose.

Defendants sold the sugars, and tendered the proceeds, in Confederate States Treasury notes, *for which the sale had been made by direction*, to the plaintiffs, who refused to take it, *claiming the sugars instead;* and the question then with them was what they should do with the proceeds. The sale "by direction" had been made for the Confederate notes, which notes were in the hands of defendants, and rapidly depreciating; and it was not surprising that the defendants should be anxious to relieve themselves from liability on

account of this fund. They offered to pay it to anybody that they thought had any color of right to receive it, but no one would take it. Finding they could not pay it to any one authorized to receive it, they "deposited *the amount* to their credit in bank, notifying the plaintiffs that it was *subject to their order at any time*." Here, it is insisted, the defendants committed a fatal error. Judge Stephens, who argued this case the second time for plaintiffs, seemed willing to admit that up to this period the plaintiffs were altogether at fault, and defendants were blameless. But he insisted, as had our learned brother Gould at the preceding Term, that defendants, by making a general and not a special deposit "to the credit of the plaintiffs," and by not keeping "the identical money tendered separate from all other, and marked as the plaintiffs'," made themselves the *debtors* of the plaintiffs for the amount; in other words, that this deposit, made under these circumstances, was a conversion of the bills to their own use, and they must account for the value of the notes at the time of the tender; and such was the view taken by the learned Judge who presided on the trial. Let us examine this view of the case, as well as the authorities relied upon to sustain it.

On the first argument, two cases were read to support this view of the question : *Robinson*, Clerk, *vs. Ward*, Gent., etc., 2 C. & P. 59 (12 E. C. L. R. 449), and *Phillips*, Ex'r., *vs. Lamar*, Sheriff, 27 *Ga. R.* 228. The case first cited was where a Solicitor received, on the 21st August, 1824, £5300, out of which he was to pay certain incidental expenses, and place the residue in the funds. The defendant, previously to the 10th September, paid the identical notes received, to the credit of his private account, at his banker's; *the bank* paid during the 11th, *but never paid after that*. The question was, which party should suffer *by the failure of the bank*, the depositary. *Under these facts*, the Court says: "The defendant should have paid this money into a banker's hands, by opening a new account in his own name, 'for the credit of Robinson's estate,' and so to ear-mark the money

as belonging to that estate; thus it would have been kept separate. But if the person having the money mixes it with his own, he thereby makes himself personally debtor to the estate. Here the defendant has mixed this money with his own, by paying it to the credit of his private account at his bankers; and he is, therefore, liable to this action." This case, doubtless, controlled the judgment of the Court below, for in his charge to the jury he says: " But having been used by defendants as their own, by being deposited to their credit, they must abide by the depreciation, and be liable for the value of the Confederate notes at the time of the tender." The facts of the two cases are by no means similar. In the case cited, an attorney received money to be invested in the funds, and between the time of its receipt and investment he deposited it with his banker, in his own name, and *the banker failed* within a few days after the deposit. In the case at bar, the *factor* had received the *property* of his *principal*, tendered it to him repeatedly, and being unable to get him to receive it, placed it with a safe depositary, subject to the order of the plaintiffs *at any time.* Plaintiffs refused the notes tendered, to which they were entitled, and claimed the sugars instead, to which they were not entitled. The defendants made the deposit in a place where the funds were always accessible to the plaintiffs; for there has not been a day, from the date of the tender to the present time, when the plaintiffs could not have obtained the notes if they had desired to do so. The difficulty about the matter was, that the notes were precisely what the plaintiffs did not want; all the time they were " claiming the sugars instead." If the bank in which the notes were deposited had failed, and plaintiffs had sued defendants to recover their value, then perhaps, the principle of *Ward and Robinson* might be nearer applicable to the case. Under the existing facts, the case is not in point. The case in 27 *Ga.* was where a Sheriff had collected money on an execution for a plaintiff, and instead of making the plaintiff, or his attorney, the depositary of the money, as the Court seemed to think he ought to

have done, deposited it in the Manufacturers' and Mechanics' Bank of Columbus, which failed some two months thereafter without paying said deposit. In that case, the Court held that: "If a Sheriff collect money, and of his own accord deposits the money in a bank which fails, he is liable to respond to the plaintiff." It is a sufficient reply, that in the case at bar there is no question arising out of the failure of the depositary. The proceeds of the sale of the sugars are, and all the time have been, subject to the order of the plaintiffs.

On the second argument of the case, at the December Term, Judge Stephens relied very confidently upon the case of the *Fulton Bank of New York vs. The Marine Bank of Chicago*, reported in 2 *Wallace S. C. R.* I have not the book before me, but think I recollect the principal facts of the case and the point decided. Early in 1862, the bank notes circulating in Chicago were some five or six cents below par, and the Marine Bank issued a notice to its customers, that it could not make collections and remittances as theretofore, unless the customers would receive the depreciated Illinois currency. Subsequent to this notice, the Fulton Bank sent to the Marine Bank, for collection, notes amounting to upwards of $3,000. In May, 1862, the notes were paid in Illinois currency, then at a discount of ten per cent. No notice was given of the collections. In answer to a letter of inquiry from the Fulton Bank as to how its account stood, the Marine Bank answered there was due the amount of the collections. By the end of the year, Illinois currency was worth only fifty cents on the dollar. The Fulton Bank then demanded payment of its claim, and the Marine Bank proposed to pay in the depreciated currency—currency which had depreciated forty per cent. from the time of its reception, until the proposed payment—the tender of payment. It appeared that the currency collected by the Marine Bank was credited on the books to the Fulton Bank, and went into the funds of the Bank, and was used in its daily business the same as any other currency on hand. No tender was ever made of the currency received, to the Fulton Bank,

until the settlement was demanded at the end of the year. Under this state of affairs, the Court held that the Marine Bank, having in May received the currency, and used it as it did its other funds; credited the Fulton Bank with the amount on its books, and never having tendered the currency until it had depreciated from *ten* to *fifty* per cent.; that the Marine Bank thereby made itself the *debtor* of the Fulton Bank, and liable to pay the value of the Illinois currency at the time of its reception. This is a very different case from the one at bar. Suppose that, instead of keeping and using money as it did the other funds of the Bank, the Marine Bank had immediately notified the Fulton Bank of the collection, and tendered in payment the currency received, and the Fulton Bank had refused to receive it, although it had authorized the reception of the currency in payment of the claims; suppose that the Marine Bank had then deposited the amount in some other safe bank, and notified the Fulton Bank that the money was so deposited, and was subject to its order at any time; and after this the Fulton Bank, all the time refusing to receive the currency, had sued the Marine Bank for the value of that identical currency which had been tendered and refused, and which was ever subject to its order. Suppose all these facts to have appeared, is there anything in the case which would raise a presumption that the Court would have held the Marine Bank liable? I think not. And yet, to make this case analagous to the one at bar, all these supposed facts would have to appear. I admit, that some of the language used by that Court in delivering the opinion, would seem to be in favor of the position assumed by counsel for the plaintiffs, yet the language of the Court must be considered in relation to the facts of the case, and thus show a case altogether different from the one at bar.

The question here is who shall suffer the depreciation of these notes, which belonged to plaintiffs—were tendered to them at the proper time, and refused. This is not the ordinary case of a *debtor*, making a tender of money to his

creditor; but that of a factor, with effects in his hands belonging to his principal. Of course, if a debtor make a tender of money to his creditor, which is refused, the effect is to protect the debtor from interest and costs; the debt remains still due, and the debtor must keep in readiness to pay whenever the creditor will receive. But a factor is not an insurer; he is bound to exercise reasonable care, skill and diligence in taking care of the effects of his principal, and when he does this he is not liable. Did defendants exercise such care in this case? " *The amount*" was deposited in a solvent bank, "subject to the order of the plaintiffs, at any time," and when sued, defendants brought the money into Court. The defendants, all the while, were trying to pay the Confederate notes, and the plaintiffs as earnestly trying to get something else, until the notes became utterly worthless. In March, when the notes were tendered and refused, the plaintiffs were "claiming the sugars instead;" and to the October Term of the Court thereafter, they sued defendants, not to recover the Confederate notes, or their value, but to recover damages for the *wrongful conversion* of the sugars. On the final trial, however, in April, 1866, when they find that they must fail in their action of Trover, the plaintiffs *ratify the sale*, and ask that defendants pay the value of the Confederate notes at the date of the tender. They admit, that the notes were tendered at the proper time, and the proper amount, which amount was subject to their order at any time; but inasmuch as the deposit was in the defendants' name, they must now pay what was the value of the notes at the time. The money was in bank, subject to the order of the plaintiffs, and "the presumption is that a check would have been paid if diligently presented." *Per Kent. J.—Cruger vs. Armstrong*, 3 *J. C.* 9. *Marzetti vs. Williams*, 1 *B. & Ad.* 415 (20 *E. C. L. R.* 541.) If the money which has been tendered becomes, after a refusal to accept thereof, current at a less value than it was current when the tender was made, the party who refused to accept the money must bear the loss. 9 *Bac. Abr.* 317; *Bouv. Ed.*

This loss was not occasioned by any negligence of the defendants, or of the depository, but from an inherent defect of the property itself.   In effect, plaintiffs neglected their property until it died of disease, the seeds of which were in it at the time it was received by defendants.   For such a loss plaintiffs ask defendants to account.   This is the whole case, and we think defendants ought not to be made to account.   The Court below held defendants to be liable, and in so holding Judge Lumpkin and I think he erred.

Judgment reversed.

HARRIS, J., Dissenting.

My convictions of the law of this case, under the agreed statement of facts, are so fixed from a very careful consideration of them—that I cannot by any process of reasoning, bring my mind to assent to the judgment rendered by the majority of this Court.

I exclude as wholly immaterial to a proper decision, all the facts as to the mistake about the sugars—which party was most in fault—as also the form of action brought.   I admit broadly that Anderson, Adair & Co., were blameable in not receiving the Confederate notes for which the sugars were sold by Ansley & Co., when *first* tendered in Court.   They were in truth and right at that time the property of Anderson, Adair & Co.   Anderson, Adair & Co. had then no claim in law or equity whatever for the sugars sold by Ansley & Co., but only to the Confederate notes paid for them by the purchaser.   I apprehend that no lawyer will dispute the proposition that, after making the tender, Ansley & Co. could, by bill in Equity, have compelled Anderson, Adair & Co. to have received said notes in payment, and to have granted to them a full acquittance from all liability for the sugars.   But no step of this kind was taken for their protection.   Ansley & Co., had they sealed up in a package the Confederate notes tendered by them, and deposited that

package in some safe and usual monied depository, *subject to the order of Anderson, Adair & Co.*, and promptly notified them of such special deposit—might also in this mode have exonerated themselves from all liability which might subsequently arise from the depreciation or destruction of said notes. Neither the one course or the other indicated, was resorted to by Ansley & Co.

So far from taking any step whatever, indicative of their considering and treating the Confederate notes as the sole property of Anderson, Adair & Co., they withdrew, immediately after the tender, the notes from Court, *and deposited them as money in Bank to their own credit, and mixed them with their own monies in said institution, and continued to use them by checking on their general deposit account for two years as their own property.*

I think that these notes were undeniably the property of Anderson, Adair & Co. The *tender admits the fact.* The mixing of these notes with their own monies by a general deposit to their *own credit*, and the *use of them* by checking on that general deposit *was an actual conversion.*

The simple question upon this state of facts, and the only legitimate one in the case is, whether Ansley & Co., did not make themselves responsible by these acts to Anderson, Adair & Co., for the value which these Confederate notes had at the time of their conversion? There is no question in the record as to what care Ansley & Co., were bound to use in reference to the notes tendered—but simply could they *use* them, could they appropriate them to their own business transactions—could they convert them to their own use without making themselves responsible for their value at the time of the conversion?

One of the distinguished counsel of the defendants in error asked "after the tender and refusal to accept, did the Confederate notes become a *waif*, which might be taken possession of by any comer or goer, and appropriated to his own purposes without responsibility to the owner? Did they become lawful objects of general plunder? Or did they still

remain the property of Anderson, Adair & Co.? If they still remained their property, they may have been in a very bad situation, indeed; with nobody bound to take even the least care of them, but surely they were not in a situation quite so bad as that Ansley & Co. could *lawfully* take them and appropriate them to their own use? Hence, the same repeated question returns on us, did Ansley & Co. appropriate these notes *to their own use?* Was the legal effect of their treatment of them a conversion?

That the use of them, by Ansley & Co., was a conversion, is demonstrated by a case in 2*d Wallace Reports p.* 252, with a force and perspicuity which I had hoped, would have led my colleagues to agree with me. The case was The Marine Bank of Chicago, after having given notice to all its customers, including the Fulton Bank of New York, that it would make collections only in the bills of the Bank of Illinois, (then at a discount of ten per cent.,) and after waiting a reasonable time, without getting any countermand of the Fulton Bank's previous order to proceed with the collection of the promissory notes which were held for it by the Marine Bank, did proceed with the collection, and collected on notes belonging to the Fulton Bank, $3,037, in bills of the Bank of Illinois, and placed the money to the credit of the Fulton Bank, with notice, that it was subject to the order of the Fulton Bank at any time. About a year afterwards, the Fulton Bank demanded a settlement. The Marine Bank offered to pay in the bills of the same Illinois Bank, (which had then fallen fifty per cent. below par,) but not the *identical* bills which were received on the collection of the notes. On these facts the Supreme Court of the United States, Mr. Justice Miller delivering the *unanimous* decision of the Court, held in affirmance of the judgment below, that the Marine Bank was bound to account *for the value which the bills of the Bank of Illinois had at the time of the collection.* The Court held, that the collection in that currency, was a proper one, after the notice which they had given, that they could not make collections in any other.

The only question in the case, as it is in this, was : How did their treatment of the Illinois Bank notes affect them? The decision of the Supreme Court of the United States was that it made the Marine Bank liable for the value of the Illinois Bank notes, *at the time* when the Marine Bank placed them to the credit of the Fulton Bank of New York, and thereby *mixed them with its own funds*, which were used in its daily business. The Court said : "It is true, that it is not in evidence what precise use was made by it of the money received for the collections, but it is proved that it was placed with the other money of the Marine Bank, and used in its daily business as its own." Again, the Court say : "If it was defendant's money, it was all right, because it could do as it pleased with its own; but if it was the *plaintiff's* money, held by defendant, as its agent, then the use of it by defendant would seem to be a *conversion.*"

Is it not manifest that the decision in *Wallace's Reports*, goes upon the hypothesis (and is it not undeniably true) that the Illinois Bank notes still remained the property of the Fulton Bank, and that as the Marine Bank, by placing them with its own funds, *and using these mixed funds* in its own daily business, *converted them*, and *thereby* became liable for the value they had at the time of the conversion?

Now, applying this principle to the case discussed, if the Confederate notes remained the property of Anderson, Adair & Co., after the first tender in Court, then Ansley & Co. *converted these notes by mixing them up in a general deposit in Bank with their funds, on which they daily checked*, in transacting their commission business, and in buying and selling, and by thus using these Confederate notes, the unquestionable property of Anderson, Adair & Co., *and not their own.*

This mixing up of the funds of Anderson, Adair & Co., with their own, and thereby destroying the identity of those Confederate notes, and the use of both together indiscriminately, was an actual conversion by Ansley & Co.

This was the precise point decided in *Wallace*, or the case decides no point at all.

Here I might rest the argument, but the view taken of the case by the majority of the Court authorizes its extension. They say in effect that, notwithstanding the mixing of the funds—the property of Anderson, Adair & Co.,—by Ansley & Co. with their own in Bank—the daily use of them in trade—the actual conversion of these Confederate notes to their own purposes—that because Ansley & Co., by letter, had said, that the Confederate notes were subject to the order of Anderson, Adair & Co. at any time, that this letter constituted *a continuing tender*, and that consequently the notes *were all the while, since* the tender in Court, *at the risk* of Anderson, Adair & Co.; and that Ansley & Co. could not be viewed in *the light of insurers*. To my mind, nothing seems clearer than that there was, in fact, but one tender. Its *legal* effect was to exempt Ansley & Co. afterwards from interest on the amount in their hands and Court costs, should Anderson, Adair & Go sue them for it. It had this extent—no more—especially as there was no separation of the funds—to preserve their identity, and deposit of them to the order of Anderson, Adair & Co.

I apprehend that it is undeniable, that, had Anderson, Adair & Co., upon the receipt of that letter, drawn their order on the bank where the Confederate notes were deposited, the Teller would not have paid it, for the plainest of all reasons: that no funds had been placed on the books of the bank to their credit. The refusal to pay in such case would not have given Anderson, Adair & Co. a right of suit against the bank. This demonstrates the proposition that the Confederate notes were *not subject to their order*, and, necessarily, that the letter could not connect itself back with the tender in Court, so as to invest it with the character ascribed to it, of its constituting " a *continuing* tender."

It is a very great mistake of fact, to assert that the Confederate notes were at all times, after the original tender in Court, *subject* to the order of Anderson, Adair & Co. So

far from this being true, (and I refer to the agreed statement of facts made by the Attorneys of the respective parties to sustain me,) I assert *that they were never for a moment subject to the order or control of Anderson, Adair & Co. up to this time*, and hence the legal conclusion, that the notes were all the while at the risk of Anderson, Adair & Co. is *unauthorized by the facts*.

I declare my utter inability, in a *legal* sense, to compre hend that letter as a *tender* at all; it contained no money, or Confederate notes; there was no exhibition of any accompanying it, nor presentment of any for acceptance.

To term it a tender is to confound, in effect, two things that are clearly distinguishable: a mere declaration of will-ingness and readiness to pay, with an *actual exhibition* of money and offer to pay it.

It should be borne constantly in memory, that a very long interval of time elapsed between the tender in Court and the "letter" spoken of, during all of which Ansley & Co. were using the Confederate notes of Anderson, Adair & Co. as their own. It is the conversion of them, by the mixing them with their own funds in bank, and the use of these mixed funds during *this interval*, that fixes the liability of Ansley & Co. to account for their value, at the time they placed them in bank to their own credit, and which destroys the connexion between the original tender and the letter, and strips the latter of the character ascribed to it of being "a continuing tender."

The idea of "a continuing tender" cannot be predicated of the Confederate notes originally tendered, as they had not been kept *separate* or marked, so as to establish their identitit; but having been mixed by the general deposit in bank, not only with the funds of Ansley & Co., but with the funds of other depositors, and the funds of the bank itself. I might safely say, that it was a moral impossibility that the Confederate notes, the property of Anderson, Adair & Co., could be tendered again, and, consequently, there could not have been "a continuing tender of them."

Paid out, as these Confederate notes must have been, on the checks of Ansley & Co., in the prosecution of trade, or to some other depositor with the bank, or by the bank to some one to whom it loaned money, or paid a debt, value was thus received for these notes, and it matters not by whom, since it was the act of Ansley & Co. which placed them beyond the order or control of the owners. The letter, under the circumstances, amounted to no more than an averment of readiness to pay to A., A. & Co. an *equal* amount of *similar* Confederate notes—equal on their face at the time the letter was written, but not made equal in value to the Confederate notes of A., A. & Co. at the time of the deposit in bank.

To conclude, Ansley & Co., having failed to adopt any one of the means suggested, by which they could have put the Confederate notes received by them for the sugars at the risk of the owners; but having converted them to their own use, as they did their own funds, and received value for them, it seems to me most unreasonable that *now*, when Confederate notes have become utterly worthless, Ansley & Co. are to be permitted to come into a Court of justice, and discharge themselves by payment in *similar* Confederate notes, *which* they happened to have on hand when the bubble burst.